Filed 2/22/22  P. v. Trujillo CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>JESUS GONZALEZ TRUJILLO,<br><br>    Defendant and Appellant. | F077583<br><br>(Super. Ct. No. MCR046166)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Jesus Gonzalez Trujillo was convicted by jury of two counts of forcible lewd and lascivious acts against a child 14 years or younger (Pen. Code,[1] § 288,

---

[1]    Further undesignated statutory references are to the Penal Code.

subd. (b)(1); counts 2 & 6) against two separate victims, and one count of lewd and lascivious acts against a child 14 years or younger (§ 288, subd. (a); count 3) against a third victim. The jury also found true as to all counts that appellant committed the offenses against multiple victims (§ 667.61, subds. (b) & (e)(4)). Appellant was sentenced to consecutive indeterminate terms of 15 years to life on each count, for an aggregate term of 45 years to life.

On appeal, appellant argues his convictions on counts 2 and 3 must be reversed because the trial court erred by admitting statements that he made to law enforcement and by excluding expert testimony on false confessions. Appellant also contends his conviction on count 6 must be reversed because the prosecution's theory at the preliminary hearing was "inconsistent and irreconcilable" with their theory at trial and because the jury was misinstructed on how to evaluate evidence of uncharged acts.

We conclude appellant's statements to law enforcement were taken in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and the court reversibly erred by allowing them to be admitted into evidence. We therefore reverse appellant's convictions on counts 2 and 3 and remand for a new trial. As such, we conclude appellant's contention regarding the expert testimony is moot and do not reach its merits. In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant was charged with sexual crimes against four minor victims: E.G., Y.S., Li.R., and Lo.R. Appellant was charged with forcible lewd and lascivious acts against a child 14 years or younger (§ 288, subd. (b)(1)) against E.G. (count 2), Li.R. (count 5), and Lo.R. (count 6) and a lewd and lascivious act against a child 14 years or younger (§ 288, subd. (a)) against Y.S. (count 3).[2]

---

[2] Appellant was also charged with violations of section 288.7 against E.G. (count 1) and Li.R. (count 4), but following their case-in-chief, the People moved to dismiss both

2.

**Count 2**

E.G. was appellant's stepdaughter. She testified that on one occasion, when she was approximately five or six years old, appellant had initiated a game of hide and seek with her and her brother. E.G.'s brother went outside to count, and appellant suggested he and E.G. hide under the bed. Once they were under the bed, appellant pulled down E.G.'s underwear and put his penis inside her. E.G.'s mother, appellant's wife, Ester, testified that on one occasion when E.G. was five years old, she washed blood out of E.G.'s underwear.

**Count 3**

Y.S. testified that she lived with Ester, appellant, and their children when she was a child. On one occasion, when Y.S. was about five or six years old, appellant took Y.S. into his room, where he got on top of her and grabbed her and kissed her. Ester tried to open the door while this was happening, but appellant held the door closed. Appellant held Y.S. against the floor with his hands on her wrists. He then put Y.S. outside the window before Ester was able to get inside.

A.G., one of appellant's stepdaughters, testified that on one occasion, she was trying to open the door to the bedroom the family shared but was unable to open it all the way. She saw appellant on top of Y.S., and he was holding the door semi-closed with his head. Ester came and opened the door, and Y.S. was gone when they entered the room.

**Count 5**

Li.R. was Ester's niece. She lived with Ester and appellant's family when she was a child. She testified that when she was in fourth grade, she was playing with appellant and Ester's young daughter when appellant came into the room. Appellant's daughter

---

counts as the statute had not been enacted at the time the acts were alleged to have occurred, and the court granted the motion.

left the room, and appellant pushed Li.R. against the wall, pulled down her skirt, and put his penis inside her. He stopped when his daughter re-entered the room.

Lo.R., Li.R.'s brother, testified he saw appellant having sexual intercourse with Li.R. on an occasion when Li.R. had been playing with appellant's daughter. He and Li.R. had never talked about this incident.

Li.R. and Lo.R.'s father and Ester's brother, Gabriel, testified he had seen appellant "playing with" or pinching Li.R.'s breasts.

**Count 6**

Lo.R. testified that he had inappropriate sexual contact with appellant on two separate occasions. On the first occasion, appellant grabbed Lo.R. and placed him on appellant's lap. Appellant proceeded to move Lo.R.'s leg on appellant's penis and Lo.R. felt appellant get "a boner." Appellant kept Lo.R. on his lap for around three minutes, then appellant said he had to use the restroom.

The second occasion occurred when Lo.R. was approximately nine and a half years old. Appellant got a phone call, and Lo.R. brought appellant the phone and waited for him to finish so he could take the phone back. When appellant was finished with the call, he told Lo.R. to come closer. When Lo.R. did, appellant grabbed Lo.R. and put him in his lap and asked him if Lo.R. "remember[ed]." Lo.R. told appellant he did not remember, and appellant let Lo.R. go and told him not to tell anyone. According to Lo.R. "nothing" happened when he was on appellant's lap during the second occasion.

**Evidence of Uncharged Acts**

A.G. testified as to a few incidents which were presented as uncharged acts tending to show appellant's propensity to commit sexual offenses under Evidence Code section 1108. She testified that when she was in seventh or eighth grade, her family went to the park, and she did not want to get out of the vehicle when they arrived. Her siblings had gotten out of the car, and appellant turned around from the front seat and tickled her. Appellant was trying to touch A.G.'s breast, and she felt uncomfortable and exited the

4.

vehicle. She also testified about another time while she was with her family at a river climbing a tree, and appellant grabbed and touched her butt. On another occasion, she was in her room looking for something in her closet, and appellant came up behind her and squeezed her breasts.

**Pretext calls**

During the investigation, law enforcement had E.G. and A.G. perform pretext phone calls to appellant, which were recorded and played for the jury.

E.G.'s pretext call was conducted on April 29, 2013. E.G. told appellant she told a counselor "what happened." Appellant told E.G. that he did not know "why you do those things," he loved her, and she ruined his life because he cannot see his daughter due to the allegations. When E.G. told appellant she wanted him to apologize, appellant said he did not remember what happened and that he "was stupid" and "drunk." He then told her "if it was like that, I am sorry, [] I ask you to forgive me." Appellant continued to tell her he did not remember anything but that if he touched her, he was sorry. When E.G. asked appellant why he touched her, appellant responded, "What do I know, sweetie? It was the damn alcohol. Oh." Appellant continued to deny remembering anything specific.

A.G.'s call was conducted on April 30, 2013. A.G. told appellant she was in counseling, and her counselor said that he had to admit what he did. Appellant told A.G. that E.G. had already called him and he told her he " 'd[idn't] remember any of that.' " A.G. then asked appellant if he remembered when she saw him with "Pili or Popi or one of them" and appellant responded, "But you don't have anything to do with that girl." A.G. asked appellant if he remembered touching her at the river when she was climbing a tree, and he told her he did not remember. He continued to deny remembering doing anything to her.

5.

**Appellant's Police Interview**

Appellant gave two statements to the police on May 9, 2013, which were recorded and played for the jury. Appellant initially denied any sexual conduct and that he had only tickled A.G. when they were at a river.

Eventually, appellant admitted on one occasion Y.S.[3] pulled him toward her, causing him to fall on top of her, and told him she wanted to "make love." Appellant caressed her back and her leg, touched her buttocks, and rubbed his penis against her through the fly of his pants. He stated there was no penetration, but he was tempted. A.G. and Ester were at the door when this was happening.

Appellant also admitted that on one occasion he came home late, drunk and high and put his finger into E.G.'s vagina.

The defense relied on the state of the evidence presented by the prosecution and did not present any additional evidence.

The jury was unable to reach a verdict on count 5 involving Li.R., and the court declared a mistrial as to that count. The jury returned guilty verdicts on the remaining counts: 2, 3, and 6.

## DISCUSSION

**I.     Admission of Appellant's Statements to Law Enforcement**

*A.     Circumstances of the Interviews*

Appellant sought to exclude appellant's statements to law enforcement, and the court conducted an Evidence Code section 402 hearing to determine their admissibility.

Sergeant Josh Chavez testified he was a qualified Spanish interpreter and was called to assist Detective Brent Cederquist in his investigation of appellant. On May 8, 2013, Chavez called appellant to see if he would come in to speak with him; he told

---

[3]     Chavez and appellant speak about Y.S. using her nickname throughout the interview.

6.

appellant he would like to ask him some questions and talk to him about "some allegations." Appellant agreed to come in that afternoon, but Chavez ended up having to reschedule, and appellant said he would call Chavez the next day. The next morning, however, appellant arrived unannounced at the police station.

Chavez met appellant in the police department lobby and was wearing slacks, a button-up shirt and tie. He took appellant into an interview room. The interview room was about 10 feet by 10 feet and contained a steel table and a couple of chairs. Detective Cederquist was in the room initially but was in and out throughout the interview. Chavez offered appellant some water and gave him his business card. Chavez asked appellant if he could slightly close the door, and appellant agreed.

The interview was recorded and conducted in Spanish, which was later transcribed into English. No *Miranda* advisements were given. Chavez began by introducing himself and Cederquist to appellant. He informed appellant he was not under arrest and asked appellant if he understood, to which appellant responded, "Yes–yes–no…." Chavez told appellant he was not detained and that he had asked appellant to come in voluntarily, to which appellant responded, "yes." At this point, Chavez said to Cederquist, "I'm doing the Beheler."

Chavez told appellant to tell him if he felt uncomfortable and that he was just going to ask appellant "a few questions." Chavez asked appellant if he felt if he was under arrest, and appellant replied he did not.

Chavez began asking appellant some personal history questions like appellant's name and date of birth. Appellant told Chavez and Cederquist he did not speak any English, was 39 years old, came to the United States from Mexico 10 years' prior, and had not had any trouble with the law. Chavez then began asking appellant about his family members, and appellant shared several details about his difficult childhood.

Chavez then asked appellant if he knew why Chavez had asked him to come in. Appellant responded by saying that three or four weeks ago, police officers had gone to

7.

his house, based on accusations E.G. had made and served him with a seven-day restraining order. Chavez told appellant Chavez wanted to resolve the accusations and that appellant was not "a criminal," as he was "not killing people or—or robbing homes." Chavez told appellant he had spoken to both E.G. and A.G. and now wanted appellant to "be free of legal problems." Appellant told Chavez he did not understand what he was being accused of, and Chavez said the children were saying appellant touched their "breasts and their private parts." Chavez explained he had spoken to the children separately and they had detailed memories of what happened. Appellant stated he did not remember anything happening, to which Chavez responded, "For me, something happened."

Chavez then spoke at length, with appellant only interjecting occasionally with "Mm-hm" or "Yes sir." Throughout this portion of the interview, Chavez made several appeals to appellant to speak about the accusations, stating "we have to resolve [this] now"; "[w]e have to sort this out now"; "we must … be honest"; and "this is the time to explain." Chavez told appellant he understood what appellant was going through because he too was "a man" and understood appellant had "mental traumas" from when he was a child and that appellant may be embarrassed.

Chavez told appellant he knew "that something happened" and that "[w]e have to talk about why this happened. Not whether this happened but what was going through [appellant's] mind." Chavez posited appellant may have done it because he was young or under the influence of alcohol, but whatever the reason Chavez reiterated he wanted to know "not if it happened, but why, so it's explained and so that you can move on and you can build a life with your daughter." Chavez told appellant that if the police had wanted to arrest him the day they served the restraining order on appellant, he would "be in jail."

Eventually appellant said, "Sir look, I will tell you this from the bottom of my heart—from the bottom of my heart. I used to have a lot of drinking problems," "but one time I tickled [A.G.]" Appellant insisted that was the only thing he could remember

8.

doing. Appellant stated that if he could remember doing anything else for certain, he would surrender himself. Chavez told appellant that when appellant spoke to the girls on the pretext calls, he "recalled other things as well." Chavez went on to tell appellant he did not want to stop appellant from "ever seeing [his] daughter ever again" and explained that if the court thought appellant was "a risk to the family," he "will never see those people again, ever again." Chavez said appellant's "situation" was not the "best one" but "it could be better in the future" and that was the reason why Chavez was asking appellant the questions.

Chavez asked appellant about some statements he made during the pretext phone calls, and appellant continued to deny remembering anything that happened. Chavez then asked appellant if he needed any water and left the room. When he returned, Chavez reminded appellant he was not under arrest, not detained, and was there voluntarily. Appellant responded, "That's fine. Don't you worry about that." Chavez then asked for details about the incident where appellant tickled A.G.

Chavez then told appellant to assume he had spoken to Y.S. and another child he referred to as Popes and asked appellant what he thought they may have told him. Appellant stated that one time when he was drunk, Y.S. pulled him towards her and he fell on top of her. Chavez asked appellant what he thought Y.S. told Chavez about that incident, and appellant responded, "Perhaps that I touched her, too?" to which Chavez responded, "But we both know that something else happened." Appellant denied that stating, "Not with [Y.S.], sir." Chavez insisted "[s]omething happened" and that he wanted the case to be over but it could not be put to an end "until everything is checked."

Chavez again told appellant he was "not trying to find out if it happened" because he "already kn[ew] that it did happen." He stated he "ha[d] enough evidence saying that it did happen. Three or more witnesses." Chavez asked appellant about a girl named Locadia, and appellant explained she used to live in the same house as he did, and she would put her leg on top of his foot, and he did not pull his foot away when she did so.

9.

Chavez asked if he had had sex with her, and appellant responded, "No sir. No. Nothing like that."

Appellant gave more details about the incident with Y.S. He stated that when he fell on top of Y.S., she told him to get up "or people will think we're making love." Chavez pointed out that Y.S. would have been five or six years old at the time and expressed confusion as to how she would know about "making love." Appellant insisted she said it, as well as something similar on another occasion. Chavez responded by saying, "So the child was a little dirty." Chavez went on to say some children grew up fast "but there's a difference between touching a child and making love by force," to which appellant responded, "Yes of course." Chavez said, "A child who is a little dirty" was a "different" situation. He again told appellant he "kn[ew] that something happened" and the question was "whether you forced her or if she was looking for you."

Chavez continued to ask for details about what happened with Y.S., and asked appellant if Y.S. "looked for [him]" and "wanted to make love with [him]," to which appellant replied, "Yes." Chavez went on to state that "things happen" and that appellant "didn't rape her." In response, appellant told Chavez "[p]enetration never happened." Chavez told appellant that "[s]omething sexual" happened. Appellant responded, "No. No…" and denied Chavez's suggestion that appellant kissed Y.S.

Appellant then told Chavez that Y.S. said to him, "Let's make love. Let's make love." Appellant admitted "stay[ing] for a little longer" but denied "penetration or anything." Appellant denied pulling Y.S.'s pants down, and Chavez told him, "It's okay if you pulled them down." Appellant again denied doing so. He also denied touching Y.S.'s breasts but admitted to touching her buttocks.

Chavez told appellant he knew "when a child behaves like that it's tough for a man to control himself." Chavez told him rape was different from "her wanting it." Chavez went on to tell appellant that he wanted appellant to "look like a man who tells the truth. This and that happened, but it wasn't forced. Both sides wanted it." Appellant

10.

responded, "Right." Chavez went on to say, "So I need to hear some details about that day in order to decipher that it happened but it wasn't forced. It wasn't—you didn't tie her down, you didn't cover her mouth or anything like that." Appellant responded, "No."

Chavez explained he wanted to hear "details" because "forced rape is different than making love when both parties want it," adding "[a]t any age" and that he wanted to know "the truth." Chavez told appellant he "kn[ew] that something other tha[n] simply touching [Y.S.'s] buttocks happened." Appellant responded, "Well I'm telling you that I caressed her here [referring to the back]. That's true." Appellant again stated he touched Y.S.'s buttocks and admitted that his "hand did stay there for a while." Chavez again asked appellant if he kissed her, which appellant denied.

Chavez continued to ask about the details of the incident with Y.S. and told appellant he "must be honest" with Chavez. Chavez told appellant if he "sa[id] no and it was that way, then it can go wrong." Chavez told appellant if he touched Y.S. a little "that's okay," but he needed to know the truth. When appellant denied grabbing Y.S.'s buttocks, Chavez responded he "need[ed] to know everything that happened."

Appellant denied touching "Popes" and stated that Y.S. was the "only child" he touched. Chavez told appellant he "kn[ew] that something else happened" and he did not want to represent appellant as a liar. Chavez told appellant to tell him what happened so he could write down "that it wasn't forced."

Chavez told appellant to remember that multiple children were accusing him and that Chavez could not believe appellant because he knew "more happened." Chavez said "something has to happen and we have to resolve this and stop talking about whether it happened but instead about why these things happened. Why did it happen with [Y.S.]? Why did it happen with [A.G.]? And why did it happen with … [E.G.]?"

Appellant responded "with [A.G.] nothing happened. Nothing happened whatsoever." Chavez told appellant he "need[ed]" appellant to "tell [Chavez] the truth,"

11.

and that appellant "can't continue lying anymore." Chavez stated that if nothing happened with A.G., "we need to leave that to rest."

Chavez continued to ask if anything sexual happened with the other girls, which appellant denied, stating "only [Y.S.] once."

Chavez continued to press appellant for "the truth." Chavez said, "We have to move forward already. I don't want to go to court and say, [appellant] says that all of the children are liars, that nothing happened and that he didn't do anything." Chavez asked appellant how he thought a judge would see that. Appellant continued to deny having sex with Locadia and that he had just touched Y.S.

Chavez asked appellant if he had sex with Y.S. and to "[j]ust [tell] the truth." Appellant responded he did rub a little against her leg but there was no "penetration." Chavez continued to ask about the incident and appellant stated he had taken his penis out through the fly and touched her leg over her pants but continued to deny penetration. At one point Chavez asked appellant "[a]nd you never put it inside?" When appellant said, "No," Chavez responded by saying, "The truth." Appellant again denied several times that he penetrated Y.S. Chavez told appellant it was "okay" to tell him "the truth." Eventually, appellant admitted, "There was a temptation."

Chavez then began asking appellant about E.G. Chavez told appellant she "already said what happened" in an interview "[w]ith a professional." Chavez suggested that perhaps E.G. loved appellant more like a boyfriend than a father and that "[t]hose things happen." Chavez told appellant "if something happened, if it was an accident or something, we have to know about that, too."

Appellant then described an incident where he told E.G., " 'There's my girlfriend,' " and E.G. hugged him and said, " 'I am your girlfriend.' " Appellant explained it was "nothing more than that. With [E.G.] that was it." Chavez asked appellant if he was sure and after appellant denied anything else happened, Chavez told

12.

appellant E.G. said something happened, and that appellant's wife was suffering but "all of this has to come up."

Appellant then started to describe an incident with E.G. when he came home at 3:00 a.m. and touched her. Chavez said he "kn[e]w something else happened with [E.G.] and it wasn't your fault but it did happen." Appellant denied anything happening in relation to a game of hide and seek.

Chavez continued to question appellant and told him "[i]f it happened all of a sudden because your pulse was racing, you were sexually aroused, that's what I want to hear. Because if you say, 'No, nothing happened.' I have to think about the worst." He went on, "I have to think, 'He's a rapist.' He can't even admit what he did, then how can I believe him? If he didn't do it with ill intentions or evil. If something happened, because you were drunk, it was an accident, perhaps it got out of hand. That's important." Chavez went on, "Or else without that I have to think that it happened and you're a bad guy. You did it for evil, you wanted to hurt them and you wanted to rape them violently. Do you understand me?" Appellant responded, "Yes sir, I do."

Chavez then asked appellant a few questions about his sexual relationship with his wife, and then told appellant, "I want an explanation about what happened and why did it happen. I want to know what happened and why? Do you understand me?" Appellant responded, "I do. With [E.G.], the truth is that…." Chavez interrupted appellant to say that he knew something happened and that appellant knew it too, that the truth needed to come out, and Chavez did not think appellant "did it because you're mean." Appellant eventually said, "Look I will tell you something, sir." He then went on to describe an incident where he got home drunk and high on cocaine and caressed E.G. He said he remembered putting his finger inside her vagina. Chavez then questioned appellant about the details of the incident, including what E.G. was wearing, whether appellant pulled E.G.'s panties down, whether appellant also put his penis in E.G.'s vagina, and how much of appellant's finger went into E.G.'s vagina. After appellant gave those details,

13.

Chavez told appellant he would "give [appellant] a moment" and the recording ended. The interview lasted about an hour and 30 minutes.

After the interview, Chavez thanked appellant and escorted him to the lobby. Chavez immediately contacted other officers and asked them to take appellant into custody based on the things appellant said in his interview. Appellant was arrested within a minute of leaving the building. When the court asked Chavez why he did not arrest appellant in the interview room, Chavez responded that based on his training and experience he could have done that, but his chosen approach was acceptable as well. Chavez testified that he concluded the interview as soon as he made the decision to arrest appellant.

Upon his arrest, appellant was immediately brought back inside the interview room and Chavez read appellant his *Miranda* rights from his department-issued card in Spanish. Chavez told appellant, "[L]isten to me. You have the right to remain silent, do you understand? Anything you say can be used against you in a court of law, you have the right to have an attorney before and during the questioning, do you understand? If you can't afford an attorney, one will be appointed to you before any questioning, do you understand?" Appellant, who had not spoken since Chavez began reading the card, said "Okay." Cederquist then began questioning appellant, while Chavez assisted him with interpreting.

Cederquist told Chavez to tell appellant that E.G. had undergone an interview where she disclosed what happened between appellant and her, and that he wanted appellant to tell him what happened between appellant and E.G. Chavez relayed to appellant that Cederquist "wants to know what happened with [E.G.] that is different to what you have already said." Appellant replied, "Just that, sir." Chavez told Cederquist "Just what … he had said to me." Cederquist then asked about an incident where appellant was under the bed with E.G. Appellant stated he did not remember the incident and that E.G. was "lying because we have never had any bed."

14.

Cederquist then stated, "Well he [referring to appellant]—he already said that he—he touched her vagina correct?" Chavez relayed the question to appellant, to which appellant responded, "Yes, that, yes." Appellant then stated that incident happened in the bedroom and he had used drugs and was very drunk. Cederquist told appellant E.G. stated he put his penis inside her, which appellant denied. Appellant stated it was a one-time incident with E.G.

Cederquist asked if it had happened "with other … young girls as well?" Appellant responded, "No, besides them, no." Chavez asked "Besides [E.G.], [Y.S.]?" Appellant responded, "No, not besides them. They are the only ones…." Chavez then asked, "And you had sex with [Y.S.]," to which appellant responded, "No." Chavez asked appellant if he just touched her leg, to which appellant responded, "I just touched her leg, just like I told you, sir." Chavez relayed to Cederquist that "[appellant] says the only person he's ever had sex with anyone and just touched—feeling on her thigh with the inner thigh with his penis and he fingered or used his pinkie to rub the inside of her vagina on [was] [E.G.]"

Cederquist then continued asking appellant if anything else happened with E.G., and appellant said, "That was the only thing," which Chavez interpreted to Cederquist as "Just the tip of his pinkie." Appellant denied penile-vaginal penetration with any child. Cederquist then asked Chavez if appellant had ever touched A.G. Without relaying the question to appellant, Chavez told Cederquist that appellant had just tickled her.

Cederquist encouraged appellant to tell the whole truth and not just a piece of the truth, and appellant continued to deny any penile-vaginal penetration and denied touching A.G. Cederquist then began asking questions about the incident appellant had already disclosed regarding E.G. Appellant stated E.G. kissed his lips and that he "accept[s] that [he] touched [E.G.] a little bit."

Cederquist asked, "And did you guys discuss, uh, the other girl?" Without relaying the question to appellant, Chavez asked Cederquist if he meant Locadia, to

15.

which Chavez replied, "Yeah", "What happened with her?" Chavez, again without relaying to appellant stated, "No sex." The interview was then terminated. It lasted about 25 minutes.

The trial court found appellant's statements from both interviews admissible. As to the first interview, the court pointed out the primary issue was whether the interrogation was custodial so as to require *Miranda* advisements. The court indicated the test it was applying is whether a reasonable person would have believed his or her freedom of movement was significantly affected by the interview. The court stated it considered the following factors which it believed weighed in the favor of finding the interrogation custodial: the length of the interview was one hour and 34 minutes; appellant was a suspect and not a mere witness; accusations were made during the interview; and Chavez indicated he did not believe appellant was telling the truth.

The court then identified factors that indicated the interview was not custodial: appellant voluntarily appeared, having driven himself to the police station, and there was no evidence his car keys were ever taken; the door to the interview room was not completely closed; Chavez told appellant numerous times he was not under arrest; appellant told Chavez he did not feel he was under arrest; appellant was never physically restrained; the detectives did not "tag-team" appellant; at one point during the interview, Chavez and Cederquist left appellant in the interview room for three minutes with the door open; and the interview was not confrontational or coercive. Balancing the foregoing factors, the trial court concluded the interview was not conducted in a coercive atmosphere such that a reasonable person would have felt a restraint on his movement that was tantamount to arrest.

As to the second interview, the trial court found appellant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. The court noted appellant was advised in his native language and "there was little risk of cultural misunderstandings," as

16.

Chavez testified "he grew up speaking Spanish with his parents." Further, the court noted appellant responded fully and completely to the questions posed by the officers.

### B. Analysis

#### 1. Admission of Appellant's First Interview

Appellant contends the court erred by admitting his first interview because it was taken in violation of *Miranda*. To protect a suspect's Fifth Amendment right against self-incrimination, prior to a "custodial interrogation," *Miranda* requires that law enforcement advise a suspect of the right to remain silent, that any statement made can be used against him or her in a court of law, that the suspect has the right to the presence of an attorney, and that if he or she cannot afford an attorney, one will be appointed. (*Miranda*, *supra*, 384 U.S. at p. 444; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

The parties agree the interview was an "interrogation," but disagree as to whether it was "custodial" so as to require that appellant be advised of his *Miranda* rights. We conclude the interview was custodial and *Miranda* advisements should have been given.

We apply a mixed standard of review, in which we review for substantial evidence the trial court's factual findings regarding the circumstances of the interrogation but independently determine whether a reasonable person in appellant's position would have felt free to end the questioning and leave. (*People v. Moore* (2011) 51 Cal.4th 386, 394–395.) "The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177.)

It is well-settled that a setting is not "custodial" "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *California v. Beheler* (1983) 463 U.S. 1121, 1125 (*Beheler*).) The question is whether there is a " 'formal arrest or

17.

restraint on freedom of movement' of the degree associated with a formal arrest."
(*Beheler*, at p. 1125.)

When there has been no formal arrest, the inquiry is whether "under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the interrogation." (*People v. Caro* (2019) 7 Cal.5th 463, 491 (*Caro*).) The inquiry looks at all objective circumstances. It does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

In making this determination, the location of the interrogation as well as whether the individual subject to the questioning is a suspect are relevant factors to consider. Other relevant factors are the duration of the interview, statements made during the interview, the presence or absence of physical restraints during the interview, whether the individual is permitted to leave at the end of the interview, and the nature and form of questioning. (*Howes v. Fields* (2012) 565 U.S. 499, 509; *Caro*, *supra*, 7 Cal.5th at pp. 491–492.) Ultimately, though the question is " 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.' " (*Caro*, at p. 491.)

*Miranda's* concern with custodial interrogation was the " 'inherently compelling pressures,' " specifically the "psychological pressures 'which work to undermine the individual's will to resist and compel him to speak where he would not otherwise do so freely.' " (*Maryland v. Shatzer* (2010) 559 U.S. 98, 103.) The *Miranda* opinion focused heavily on the psychologically coercive nature of police questioning, discussing at length interrogation tactics outlined in police manuals.

*Miranda* noted one of the main contributing factors to a psychologically coercive environment is privacy, and police are instructed that interviews should take place in the investigator's office or a room of his or her own choosing. (*Miranda*, *supra*, 384 U.S. at p. 449.) Other techniques that contribute to such an environment include: (1) displaying

18.

"an air of confidence in the suspect's guilt" and positing the guilt of the suspect "as a fact"; (2) directing comments "toward the reasons why the subject committed the act, rather than … whether he did it"; (3) pointing out difficulties in the subject's life which may have led him or her to commit the offense; (4) minimization of the moral seriousness of the offense; and (5) casting blame on the victim. (*Miranda*, *supra*, 384 U.S. at p. 450.) The *Miranda* court explained "[t]hese tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty. Explanations to the contrary are dismissed and discouraged." (*Ibid*.)

*Miranda* also discussed other tactics including creating "an oppressive atmosphere of dogged persistence," as well as offering legal excuses for the subject's actions to obtain an initial admission. (*Miranda*, *supra*, 384 U.S. at p. 451.) Further techniques include a "friendly-unfriendly" two-investigator act and trickery. (*Id*. at pp. 452–453.) Finally, *Miranda* noted investigators are instructed to "point out the incriminating significance of the suspect's refusal to talk," for example by saying, " 'Suppose you were in my shoes and I were in yours and you called me in to ask me about this and I told you, "I don't want to answer any of your questions." You'd think I had something to hide, and you'd probably be right in thinking that. That's exactly what I'll have to think about you, and so will everybody else. So let's sit here and talk this whole thing over.' " (*Id*. at p. 454.)

Courts have put significant weight on the nature of the questioning in determining whether an interrogation is custodial. " '[A]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect, that he is not free to leave' than would general and neutral investigative questions. Thus, on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1164.) Relatively recent

19.

California cases have explained that though an interaction may start out voluntary, the nature of the questioning can turn it custodial. (See *People v. Saldana* (2018) 19 Cal.App.5th 432 (*Saldana*); *People v. Torres* (2018) 25 Cal.App.5th 162.)

For example, *Saldana* presents a similar factual scenario to the one before us. In *Saldana*, the defendant was a 58-year-old Mexican immigrant with no notable criminal history whom two girls had accused him of molesting them. (*Saldana*, *supra*, 19 Cal.App.5th at p. 436.) The police requested he come into the station for questioning, where the defendant was not given *Miranda* advisements but was told he was not under arrest " 'right now' " and was free to leave. (*Saldana*, at pp. 436–437.) The police questioned the defendant for about 40 minutes, used several interrogation techniques including manifesting a belief that the defendant was guilty and indicating that all denials would fail. (*Id.* at p. 437.) The defendant made inculpatory admissions and was arrested a few minutes after the interview was concluded, about a block from the station. (*Id.* at p. 461.)

The *Saldana* court explained, "Where … police indicate to the defendant their resolute belief he committed the crime, the custody inquiry becomes whether a reasonable person in the defendant's situation—i.e., having been told by the police that they know he committed the crime—would think he was free to break off the interview and leave," noting "[c]ourts have concluded that, under the circumstances of the particular case, advising the suspect that he was not under arrest and was free to leave was insufficient to support a conclusion that he was not in custody for purposes of *Miranda*. (See, e.g., *U.S. v. Hashime* (4th. Cir. 2013) 734 F.3d 278, 284 [telling the individual being interrogated he is free to leave ' "is not 'talismanic' or sufficient in and of itself to show a lack of custody" ']; *U.S. v. Cavazos* (5th Cir. 2012) 668 F.3d 190, 195 [] [same].)" (*Saldana*, *supra*, 19 Cal.App.5th at p. 458.)

The *Saldana* court concluded in light of the relevant factors, putting significant weight on the nature of the interrogation, "a reasonable person in [the defendant's]

position eventually would have realized that telling the 'truth' meant admitting the detective's information was correct—and that until this 'truth' came out, the person could not leave." (*Saldana*, *supra*, 19 Cal.App.5th at p. 458.) The *Saldana* court explained the detective's "insistence that [the defendant] was guilty, his disbelief of [the defendant's] many denials, and his use of classic interrogation techniques reflects the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract…. [¶] Over and over again, [the detective] conveyed the message that [the defendant] had no meaningful choice but to admit some version of the crime because continued denials—in light of the extensive and irrefutable evidence against him—was simply futile. Insisting on the 'truth' until [the defendant] told him what he sought, the objective message conveyed was that [the defendant] would be interrogated until he admitted touching the girls." (*Id.* at p. 460.) "[T]he accusatory nature of the questioning" in *Saldana* among the other relevant factors "objectively conveyed that [the defendant] was not free to leave." (*Id.* at p. 462.)

Applying the above principles to the present case, we acknowledge some factors weigh in favor of a finding the interrogation was not custodial: appellant voluntarily arrived at the police station and was not under formal arrest or physically restrained; the door to the interview room was open; and appellant indicated at the outset of the interview and about a third of the way through the interview he understood he was not under arrest. However, viewing these factors in context of the totality of the circumstances, keeping in mind the principles we have set forth above, we conclude the interrogation had become custodial by the time he began making inculpatory statements.

First, the interview was conducted at the police station in an interview room, with only appellant and Chavez, and sometimes Cederquist, present. As *Miranda* explained, according to police manuals, this "privacy" helps "deprive[] [the suspect] of every psychological advantage" as opposed to his home where he "may be confident, indignant,

21.

or recalcitrant" and be "more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior." (*Miranda*, *supra*, 384 U.S. at pp. 449–450.)

Second, not only was appellant *a* suspect, but he was the *sole* suspect. Multiple minor victims had accused him of sexual abuse, and the investigative object in speaking to appellant was not to learn any neutral details of the crime but to obtain a confession. Relevant to our analysis, which turns on what was objectively conveyed to appellant, appellant knew at the time of the interview he had been accused of molestation by at least E.G. and A.G. and potentially two others, and found out during the interview he had already been the subject of the pretext phone calls. Further, just as Chavez began to ask about the abuse allegations, he told appellant the police could have already arrested him if they had "wanted to," in which case appellant would "be in jail" already and that Chavez already had "enough evidence" to prove he had committed the offenses. As the *Saldana* court explained: " ' "The awareness of the person being questioned by an officer that … the police have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom." ' " (*Saldana*, *supra*, 19 Cal.App.5th at p. 458.)

Chavez's questioning about the allegations was exclusively accusatory; he never asked neutral or investigative questions about the allegations. Rather, once Chavez began asking appellant about the allegations, he used almost every technique specified in *Miranda* that the court suggested contributed to psychological coercion the safeguards of *Miranda* are meant to mitigate. Chavez posited appellant's guilt as fact, consistently and repeatedly directed his questioning toward "why" "it happened," not "whether it happened" because Chavez already "kn[ew] that it did happen." He mentioned appellant's difficult childhood stating it caused him "mental traumas" and presented multiple explanations for appellant's behavior ("[w]as it … due to your youth that it happened or something … [o]r was it alcohol"); minimized the seriousness of the offense ("there's a difference between touching a child and making love by force"); victim

22.

blamed ("[s]o the child was a little dirty"); and offered legal excuses ("forced rape is different than making love when both parties want to" "[a]t any age"). The above are just examples of each technique; the entire interview was replete with other iterations of these techniques and Chavez frequently switched between them, again, never relying on neutral, investigatory questioning.

As the interview went on, Chavez started directly telling appellant he was lying when he outright denied particular sexual acts. Chavez also began suggesting appellant's admissions were necessary to vindicate him of violent acts. He repeatedly said things like he "need[ed]" details so he could determine "it wasn't forced." Eventually, shortly before appellant admitted to digitally penetrating E.G., this suggestion became more concrete; Chavez told appellant, "If it happened all of a sudden because your pulse was racing, you were sexually aroused, that's what I want to hear. Because if you say, 'No, nothing happened.' I have to think about the worst." Chavez went on to say, "I have to think, 'He's a rapist.' He can't even admit what he did, then how can I believe him?" Chavez again told appellant if he *did not tell him what happened*, he would assume appellant "did it for evil, [that] you wanted to hurt them and you wanted to rape them violently." In essence, Chavez gave appellant only two options: (1) admit he molested the children "because [he was] sexually aroused" or for some other reason; or (2) deny he molested the children and be considered a violent rapist. This technique is also significant because it hearkens back to another specifically mentioned by the *Miranda* court: "point[ing] out the incriminating significance of the suspect's refusal to talk."

The interview here was like the one in *Saldana* where the combination of factors created "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." (*Saldana*, *supra*, 19 Cal.App.5th at p. 460.) We conclude the culmination of this persistent and methodical accusatory questioning wherein Chavez employed varied interrogation techniques specifically highlighted in *Miranda* as being psychologically coercive, along with the factors that appellant was at the station and the

23.

sole suspect of the molestations, would lead a reasonable person to believe, despite being told he or she was not under arrest at the outset of the interview, that he or she was unable to leave until he or she gave the investigator the confession he wanted. We agree with the *Saldana* court's assessment of the use of similar interrogation tactics to those used here: "These tactics are not unusual, nor are they unreasonable. In fact, if [the defendant] had been properly *Mirandized* and made the same confession, it might be called good police work. But such an interrogation is associated with 'the full-blown interrogation of an arrestee, and except for a *Miranda* advisement, we cannot conceive how [the defendant's] interrogation might have differed had he been under arrest.' " (*Saldana*, at p. 460.)

Finally, weighing in favor of the setting being custodial, appellant was arrested within a minute of leaving the station. (See *Oregon v. Mathiason*, *supra*, 429 U.S. at p. 495 [finding significant in concluding a noncustodial setting that the suspect was able to "leave the police station without hindrance"]; *Beheler*, *supra*, 463 U.S. at p. 1121 [same].)

We conclude based on all the relevant factors, a reasonable person in appellant's position would not have felt free to terminate the interview and leave, and therefore the first interview was custodial. Accordingly, appellant's statements were taken in violation of *Miranda* and were inadmissible.

### 2. Admission of Appellant's Second Interview

As for the second interview, appellant contends that his *Miranda* waiver was invalid because it was involuntary due to Chavez "softening [him] up" by interrogation strategies such as minimization, manifested belief in his culpability, false advice and/or it was "vitiated by the initial unconstitutionality." We agree with appellant the statements made in his second interview were inadmissible based upon the circumstances.

Appellant contends the waiver obtained in the present case was like the one obtained and deemed to be invalid by the California Supreme Court in *People v.*

*Honeycutt* (1977) 20 Cal.3d 150 (*Honeycutt*).  In *Honeycutt*, the defendant was arrested and placed in the backseat of a patrol car, transported to the police station, and placed in an interview room.  (*Id*. at p. 158.)  The defendant was initially hostile toward one of the detectives, who left the room.  (*Ibid*.)  Another detective, with whom the defendant was acquainted through previous police contacts engaged the defendant in a half-hour unrecorded discussion where they discussed unrelated past events, former acquaintances, and finally, the victim.  (*Ibid*.)  The detective began disparaging the victim, in an effort to "try to get [the defendant] to talk."  (*Ibid*.)  The detective observed the defendant "softening up" and the defendant, after a 30 minute discussion, indicated he would talk about the crime for which he was arrested.  (*Ibid*.)  The defendant was then advised of his *Miranda* rights which he indicated he understood and waived.  (*Honeycutt*, at p. 159.)

The *Honeycutt* court found the "conversation-warning-interrogation sequence" used in that case should have been preceded by a *Miranda* advisement.  The *Honeycutt* court relied on the following passage from *Miranda* to come to its conclusion:

> " 'Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights.  In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so.  It is inconsistent with any notion of a voluntary relinquishment of the privilege.  Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.  The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.' " (*Honeycutt*, *supra*, 20 Cal.3d at pp. 159–160.)

The *Honeycutt* court reasoned:  "The police by applying practices condemned in *Miranda* cannot be heard to contend that they should benefit because they have violated only the spirit of *Miranda*.  It must be remembered that the purpose of *Miranda* is to preclude police interrogation unless and until a suspect has voluntarily waived his rights or has his

25.

attorney present.  When the waiver results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interrogation without a *Miranda* warning is deemed to be involuntary." (*Honeycutt*, *supra*, 20 Cal.3d at pp. 160–161.)  The *Honeycutt* court accordingly held the trial court erred when it refused to suppress the defendant's statements.  (*Id*. at p. 161.)

Here, more than just a "conversation" like the one in *Honeycutt* preceded the *Miranda* advisements; rather, appellant was subject to a full-blown interrogation that involved much more than the "softening-up" of the *Honeycutt* defendant.  Not only did the interrogation involve disparaging of the victims and rapport-building with appellant, but all the other interrogation techniques we have discussed above.

It, too, appears from the record the lengthy first interview was a result of Chavez's intentional effort to avoid reading appellant *Miranda* rights evidenced by Chavez's characterization of the first interview as "doing the Beheler."  In *Beheler*, the defendant was attempting to steal from a victim who his acquaintance eventually shot and killed. (*Beheler*, *supra*, 463 U.S. at p. 1122.)  The defendant called the police and told them who killed the victim and that the gun was hidden in the defendant's backyard.  (*Ibid*.)  The defendant gave the police consent to search his yard, where the gun was found.  (*Ibid*.) The defendant further agreed to accompany the police to the station house where he was told he was not under arrest, not advised of his *Miranda* rights, and was interviewed for less than 30 minutes.  (*Beheler*, at p. 1222.)  The defendant was told his statement would be evaluated by the district attorney, was permitted to leave, and was arrested five days later.  (*Ibid*.)  The United States Supreme Court held the unwarned statements were admissible in substantial part because the defendant was not under formal arrest or restrained when he made his statements.

By indicating he was "doing the Beheler," it appears Chavez intended to obtain incriminating statements from appellant without advising appellant of his *Miranda* rights by attempting to recreate the factual circumstances of *Beheler* by not arresting or restraining appellant and allowing him to leave before arresting him. We find this, combined with the custodial nature of the first interview which we have discussed above, clear evidence of an intent to circumvent at least the spirit of *Miranda*. We conclude this tactic resulted in a situation like *Honeycutt* where appellant was, as a result of the lengthy interview that had already taken place, inappropriately "softened up" into waiving his *Miranda* rights before the second interview.

The present case is also analogous to the United States Supreme Court case, *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*), where the court analyzed a "two-step interrogation" or "question-first" tactic of a suspect in custody. We find the analysis there instructive.

In *Seibert*, the defendant was taken into custody and questioned without *Miranda* warnings for 30 to 40 minutes, during which the defendant made inculpatory statements. (*Seibert*, *supra*, 542 U.S. at pp. 604–605 (plur. opn. of Souter, J.).) The defendant was then given a 20-minute coffee and cigarette break, given *Miranda* warnings, and signed a waiver of rights. (*Seibert*, at p. 605.) *Seibert* concluded the warned statements were inadmissible. The plurality explained that the circumstances "must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." (*Seibert*, at p. 617.)

The *Seibert* plurality listed several relevant factors to determine whether "*Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's

27.

questions treated the second round as continuous with the first." (*Seibert*, *supra*, 542 U.S. at p. 615.) Also relevant is whether "a reasonable person in the suspect's shoes could have seen the [second] questioning as a new and distinct experience," rendering "the *Miranda* warnings … as presenting a genuine choice whether to follow up on the earlier admission." (*Id.* at pp. 615–616.)

Justice Kennedy authored a concurring opinion expressing the view that the plurality's test, which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations," was too broad. (*Seibert*, *supra*, 542 U.S. 600 at pp. 621–622 (conc. opn. of Kennedy, J.).) Justice Kennedy proposed a "narrower test applicable only in the infrequent case … in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning."[4] (*Id.* at p. 622.) Justice Kennedy explained, "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." (*Ibid.*) Justice Kennedy's examples of "curative measures" included, "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. [Citations.] Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient." (*Ibid.*)

---

**4**     This was the case in *Seibert*. There, the interrogating detective "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.' " (*Seibert*, *supra*, 542 U.S. at pp. 605–606.)

Under either *Seibert* approach, we find further reason to conclude appellant's warned statements inadmissible. (See *People v. Krebs* (2019) 8 Cal.5th 265, 309 [declining to decide which approach should be applied].)

Applying the factors set forth by the plurality, we conclude the *Miranda* warnings given before the second interview could not have had their intended effect. The first interview was substantially longer and more involved than the second interview. The first interview was approximately an hour and 30 minutes long, and the second interview was approximately 25 minutes long. The transcript of the first interview was 60 pages long, and the second was 14 pages long. This difference is even more stark when considering that the second interview involved translation of Cederquist's questions into Spanish. The first interview contained more detailed statements by appellant and were obtained after Chavez rejected many of appellant's denials and used, as we have discussed, many calculated and ultimately successful interrogation techniques. The first interview was referenced several times during the course of the second, with several instances of Cederquist and Chavez discussing among themselves statements appellant made in the first interview and relying on them to have appellant repeat what he had already stated and to obtain further admissions. Moreover, the interviews happened within minutes of one another in the same interview room. Though Cederquist was primarily asking the questions in the second interview, Chavez, who had already developed a rapport with appellant, was present the entire time and doing the interpreting, and, on a few occasions, editorialized appellant's answers with Chavez's own summaries of appellant's statements from the first interview. Given these considerations, we conclude a reasonable person in appellant's shoes would not have seen the second questioning "as a new and distinct experience" (*Seibert*, *supra*, 542 U.S. at pp. 615–616), rendering the *Miranda* warnings given ineffective.

Further, under Justice Kennedy's approach, while no direct evidence was presented as to the subjective intent behind the two-step questioning in the present case,

the circumstances of the interview, including the various factors set forth in the plurality opinion, demonstrate "objective indications of a subjective intent to frustrate *Miranda*." (See *People v. Sumagang* (2021) 69 Cal.App.5th 712, 728.) Most evident of this intent is Chavez's statement at the beginning of the first interview, as we have discussed, that he was "doing the Beheler." As no curative measures described by Justice Kennedy were taken, under this approach, we conclude appellant's statements from the second interview were not admissible.

We agree with appellant that the prewarning interaction in the present case rendered appellant's subsequent waiver invalid and that the second interview was inadmissible.

### 3.    Harmlessness

Concluding neither statement from the first nor second interview were admissible, our final inquiry is whether the error in admitting them was harmless. We conclude the error was not harmless. "The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24)." (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029.) The People bear the burden " 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted.' " (*Id*. at p. 1029.) "Because confessions ' "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt …, the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard.' " (*Ibid*.)

The *Henderson* court listed several examples of circumstances which could render an erroneous admission of a confession harmless: " '(1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are

numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime ….' " (*People v. Henderson*, *supra*, 9 Cal.5th at p. 1030.) This list is "not intended to be exhaustive," but "exemplif[ies] the kind of strong evidence required to satisfy the *Chapman* standard." (*Ibid*.)

Here, we cannot conclude the error was harmless beyond a reasonable doubt. The jurors requested the transcript of the interview "between Chavez and [appellant]," indicating it contributed to the jurors' decision-making process. They also asked for the pretext call transcripts, E.G.'s testimony, Gabriel's testimony, and Li.R.'s forensic interview. That the jury was unable to reach a verdict on the charge involving Li.R., who was not discussed in appellant's statements, despite corroborating evidence such as Lo.R.'s testimony and her forensic interview, is notable and raises a reasonable inference that appellant's statements did contribute to the verdicts on the charges against Y.S. and E.G.

We note that under *Chapman*, it is not enough that " 'in a trial that occurred without the error, a guilty verdict would surely have been rendered.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.) We must instead ask " 'whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' " (*Ibid*.) Here, we cannot answer that question affirmatively. The admission of appellant's statements was not harmless.

## II. Exclusion of Expert Testimony on False Confessions

Appellant sought to introduce testimony from an expert on false confessions to support an assertion that appellant's inculpatory statements made during his interviews with law enforcement were not reliable. The trial court excluded the proffered testimony in pertinent part because appellant had not recanted or otherwise provided evidence the

inculpatory statements were false. Appellant contends the trial court's exclusion of the testimony was error.

Because we have concluded the statements appellant made to law enforcement were inadmissible, we need not determine whether the trial court's exclusion of the expert's testimony was error, as the issue is moot.

## III. Count 6

### A. *Relevant background*

At the preliminary hearing on the charges related to Lo.R., a detective testified Lo.R. reported in a forensic interview appellant had touched him on two separate occasions. On the first occasion, appellant touched Lo.R.'s buttocks under the clothing, then picked him up and placed him on his lap. Appellant grabbed Lo.R.'s leg and rubbed it back and forth on his erect penis. Appellant told Lo.R. to get off and went to the bathroom.

On the second occasion, appellant asked Lo.R., "Do you remember what happened?" and Lo.R. told him he did not. Appellant then picked up Lo.R. and put him on his lap and kept asking if he remembered what happened. Lo.R. believed appellant was referring to the previous incident. Appellant did not grab Lo.R.'s leg as he had done previously, and after approximately one minute, Lo.R. got down from appellant's lap and ran back to his house. Appellant told Lo.R. not to tell anyone.

During argument at the preliminary hearing, the court asked the prosecutor to comment on the force and duress element on the charge against Lo.R. The prosecutor argued that appellant picked Lo.R. up and moved him around on his lap to gain an erection, which was sufficient force under the statute.

In ruling, the court stated as to the count related to Lo.R., "it is a closer call [than the other charged offenses as to the element of force], … the act that was described was [appellant's] manual stimulation of himself using the child as basically an instrumentality

32.

for that stimulation. In this instance, that could have occurred without placing the child in his lap and moving the … child's leg." The court held appellant to answer to count 6.

During motions in limine, in a discussion regarding the admissibility of the Evidence Code 1108 evidence, the prosecutor informed the court "[Lo.R.] had two acts." She went on to explain the *second* act was the charged act and the first act where Lo.R. felt appellant's erect penis was the uncharged act.

The following day the prosecution again confirmed that the second act was the charged act and the first act was the uncharged act. The court then asked for argument on why the uncharged act should be admitted. The prosecutor argued the evidence was "highly probative," as it showed appellant's propensity to commit sexual acts against the children. Defense counsel argued the evidence on uncharged acts was cumulative, and he focused primarily on A.G.'s proffered testimony arguing she was the fifth witness being brought in solely to testify as to Evidence Code section 1108 evidence.

In ruling, the court summarized that the uncharged act with regard to Lo.R. was that appellant touched Lo.R.'s bare buttocks under his clothing and rubbed his leg against appellant's erect penis. The court, after weighing the probative value versus the prejudicial nature of the proffered evidence of the uncharged acts, ruled it was admissible.

The jury was instructed with CALCRIM No. 1191A that the People had presented evidence that appellant committed the uncharged crime of lewd or lascivious act with a child under 14 years by force or fear against Lo.R. The court instructed the jury they could consider the evidence only if the People proved by a preponderance of the evidence that appellant committed the uncharged offense. The court further instructed the jury that if they decided appellant committed the uncharged offense, they could conclude from that evidence appellant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that appellant was likely to commit and did commit the charged offenses. The court instructed the jury the conclusion was "only one factor to consider

33.

along with all the other evidence" and was "not sufficient by itself to prove that [appellant] is guilty of [the charged offense]" and "[t]he People must still prove each charge beyond a reasonable doubt."

The court also instructed the jury with CALCRIM No. 1191B, which provided that the People had presented evidence appellant had committed the charges in counts 2, 3, 5, and 6. The court instructed that if the jury found the People had proved beyond a reasonable doubt that appellant had committed one or more of the charged offenses, they could conclude appellant was disposed or inclined to commit and did commit the other sex offenses charged in this case. The court further instructed that it was only one factor to be considered, and the People were still required to prove each charge and allegation beyond a reasonable doubt.

In closing argument, the prosecutor explained to the jury that the second act regarding Lo.R. was the charged act and the first act was the uncharged act. The prosecutor argued, "[t]he first act tells you what the second act is really about," explaining the jury could infer appellant's intent from the first act.

### B.     Analysis

#### 1.     "Inconsistent and Irreconcilable Theories"

Appellant argues that by arguing at the preliminary hearing that the first act was the charged act and later arguing at trial the second act was the charged act while also presenting evidence of the first act as an uncharged act, the prosecutor was using "inconsistent and irreconcilable theories," violating appellant's due process rights. Respondent contends appellant forfeited the issue and appellant contends that if we find the issue is forfeited, that his trial counsel provided ineffective assistance of counsel by failing to object. We need not discuss whether appellant forfeited the issue and reject his claim of ineffective assistance of counsel because appellant has failed to show any prejudice arising from this alleged error. (*Strickland v. Washington* (1984) 466 U.S. 668,

34.

687 [to make a successful claim of ineffective assistance of counsel, appellant must establish prejudice occurred].)

The case appellant cites as authority that a prosecutor's use of "inconsistent and irreconcilable theories" violated his due process rights is *In re Sakarias* (2005) 35 Cal.4th 140. In *Sakarias*, the California Supreme Court found a due process violation where a prosecutor had sought convictions against two defendants using "inconsistent and irreconcilable factual theories." (*Id*. at p. 163.) The prosecutor had deliberately omitted evidence in one trial that had been used in another, which the court concluded showed bad faith. (*Ibid*.) The *Sakarias* court held "the prosecutor's unjustified use of inconsistent and irreconcilable factual theories to convict two people of a crime only one could have committed, or to obtain harsher sentences for both on the basis of an act only one could have committed, violates due process because in those circumstances the state has necessarily convicted or sentenced a person on a false factual basis." (*Id*. at p. 164.)

We cannot see, nor does appellant explain, how this case supports his claim. We do not see the connection between the "inconsistent and irreconcilable" factual scenarios used to convict two individuals of the same crime and the circumstances in the present case. The factual scenarios here, the two instances where appellant put Lo.R. on his lap, are not "inconsistent and irreconcilable" in that the prosecution consistently alleged both at the preliminary hearing and at trial that they both occurred. In other words, a finding that one of these instances occurred does not preclude a finding that the other instance did not. Moreover, appellant does not explain how he was prejudiced.

A trial court may, in its discretion, permit amendment of the information at any stage of the proceedings, provided the amendment does not change the offense charged by the original information to one not shown by the evidence taken at the preliminary examination. (§ 1009; *People v. Winters* (1990) 221 Cal.App.3d 997, 1005.) If the defendant's substantial rights would be prejudiced by the amendment, the court may grant a reasonable continuance no longer than the ends of justice require. (§ 1009;

35.

*Winters*, at p. 1005.) "Trial court discretion, in granting a motion to amend, 'will not be disturbed on appeal in the absence of showing a clear abuse of discretion.' " (*People v. Bolden* (1996) 44 Cal.App.4th 707, 716.)

As respondent argues, an argument to which appellant does not address in his reply brief, the trial court, in effect, allowed a constructive amendment to the information. The constructive amendment was permissible because the amendment conformed to the evidence presented at the preliminary hearing and because appellant was on clear notice of the prosecutor's plan to present the first incident as an uncharged act and the second incident as the charged act early in the trial. When the prosecutor explained which of the acts was the charged act in open court, there had only been one day of evidence; Lo.R. did not testify until three days later, and evidence did not close until eight days later. Appellant had ample time to defend against both acts involving Lo.R. and does not make any argument to the contrary. Appellant notably does not contend that count 6 was supported by insufficient evidence or that the court erred by admitting the first act as uncharged propensity evidence under Evidence Code section 1108.

We find no violation of due process.

### 2. Jury Instructions

Related to this argument, appellant also argues that the jury instructions lowered the prosecution's burden of proof for count 6. He reasons that because the jury was only required to find the first act (the "more graphic incident elected by the prosecution at the preliminary hearing") true by a preponderance of the evidence, and were instructed they could use it to conclude disposition to commit count 6 ("the previously uncharged offense"), this allowed them to convict on count 6 by only a preponderance of the evidence. Appellant relies on *People v. Cruz* (2016) 2 Cal.App.5th 1178 (*Cruz*), which is inapposite.

In *Cruz*, the trial court instructed the jury that " '[i]n determining whether defendant has been proved guilty of any sexual crime of which he is charged, you should consider all relevant evidence, including whether the defendant committed any other sexual crimes, whether charged or uncharged, about which evidence has been received.' " (*Cruz*, *supra*, 2 Cal.App.5th at pp. 1183–1184.) The court went on to instruct the jury if they found " 'by a preponderance of the evidence, that the defendant committed any such other sexual offense you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses.' " (*Id*. at p. 1184.)

This court reversed, holding that the instruction effectively lowered the standard of proof because it suggested that *charged* offenses needed only to be proved by a preponderance of the evidence before they could be used as propensity evidence. (*Cruz*, *supra*, 2 Cal.App.5th at p. 1186.) This court suggested that "a jury instruction explaining the use of currently charged offenses to show propensity under Evidence Code section 1108 must … specify[] that a currently charged offense must be proved beyond a reasonable doubt before it can be used as propensity evidence in support of another currently charged offense." (*Id.* at p. 1186.)

The *Cruz* court's suggestion is exactly how the jury was instructed here. The jury was expressly instructed it needed to find the charged acts true beyond a reasonable doubt before being used as propensity evidence. (CALCRIM No. 1191B.) The court also correctly instructed the jury that it needed only to find the uncharged act true by a preponderance of the evidence but reiterated that even if it found an uncharged act true, it was still required to find the charged offenses true beyond a reasonable doubt. (CALCRIM No. 1191A.)

This case is more like *People v. Reliford* (2003) 29 Cal.4th 1007, where the defendant made an argument like appellant has here, that "having found the uncharged sex offense true by a preponderance of the evidence, jurors would rely on 'this alone' to convict him of the charged offenses." (*Id*. at p. 1013.) Our high court in *Reliford* readily

rejected this argument stating, "the instruction nowhere tells the jury it may rest a conviction solely on evidence of prior offenses.  Indeed, the instruction's *next sentence* says quite the opposite: 'if you find by a preponderance of the evidence that the defendant committed a prior sexual offense …, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime.' "  (*Ibid*.)

Like in *Reliford*, "Nothing in the instructions authorized the jury to use the preponderance-of-the-evidence standard for anything other than the preliminary determination whether defendant committed a prior sexual offense."  (*People v. Reliford*, *supra*, 29 Cal.4th at p. 1016.)  As such, it is not "reasonably likely a jury could interpret the instructions to authorize conviction of the charged offenses based on a lowered standard of proof."  (See *id*. at p. 1016.)

We find no error.

## DISPOSITION

We reverse appellant's convictions on counts 2 and 3 and remand for a new trial on those counts.  In all other respects, the judgment is affirmed.


                               DE SANTOS, J.

WE CONCUR:


LEVY, ACTING P. J.


MEEHAN, J.